I'll call on the final case of the morning in the interest of D.H., Jr., J.H., and K.H. Minors, cases No. 5, 17-0206, 5-17-0207, and 5-17-0208. Before calling the appellant, I understand there's been an issue concerning the briefing, and I would call on the counsel of the state to explain what that issue is and how the counsel would ask the court to address it. Thank you, Your Honor. First, the state apologizes, but we did not receive Mom's brief. We actually thought that she had decided not to appeal because we never received anything in the mail. We arrived today and saw the second name from Mom's counsel, and that's when we found out that she was still a part of the party. And so, understanding the vast nature of these kinds of cases, we understand if the court wishes to proceed with oral argument, but we would ask leave of the court for two weeks to file an answer to her brief just so that we're able to appropriately address any arguments that she raises that we just aren't aware of. If that leave is granted, how much time does counsel need to respond? Let the record reflect one week for the appellant to file a reply. Two weeks for the state, and one week after that for the reply. Thank you, Your Honor. Thank you. You may proceed and call on the appellant. May it please the court. Pardon, counsel. I'm here today to represent the mother appellant in this case. This case is a little different than most cases in my eyes. This case started out with the children of mother and father being found out roaming the streets at 1230 in the afternoon. Mother was inside the house sleeping. Now, I think it's easy for us all to agree that unless there's some circumstance outside normal control, a parent should not be sleeping at 1230 in the afternoon while their kids are out running in the streets. How old was the child at the time? Your Honor, at the time the kids were 3, 4, and 5. So was this all three of them? All three of them. The mother suffers from epilepsy and also a seizure disorder. Those things prevent her from working, and they also prevent her from driving. She has got those issues, and when this case was started, she made them aware to her initial caseworker. However, as this case progressed, she received a counselor. The counselor was unaware of the transportation issues that mother had because she had no driver's license. And the caseworker, Casey Beal, who finished the case up, she was also not really aware of the driver's license issue because she never asked. She knew that mom wasn't complying with parts of the service plan, but never asked why. Why didn't you go to counseling? None of those questions were asked. Mother also had an issue with the medical card. That prevented her from seeking the specialist help she needed to deal with her epilepsy issues and her seizure disorder issues because the state of Illinois is not paying quick enough to have professional specialist physicians taking on new cases. So she finally did find a physician around the end of this case, actually, in December of 16, found a neurologist up in the Springfield, Illinois area to consult with. And a consultation, I believe, was made initially. But at that point in time, this case was already in the process of termination. And I said to the court that from the very get-go in this case, the caseworkers in this case were looking at it through the lens of an eventual termination. I don't believe that the service plan that was created was formulated to deal with the issues that mother had, which led to the removal of the kids from the home. It's undisputed that mother was not making very good progress with her service plan. But the questions were never asked, why is she not making this progress? Had the caseworkers and the counselors been more attentive to the problems, the specific problems that mother had with her epilepsy and her seizure disorders, they may have been able to formulate a service plan better equipped to deal with those issues and given mother a fighting chance at making progress on this service plan. From the get-go, if those issues, the seizures and the epilepsy, aren't addressed, these other issues in the service plan, mom's never going to be able to comply with. Therefore, tearing this family apart. This case is very important to the families and the parties involved in this case. But it's also important to these types of cases in general because DCFS and the caseworkers need to make plans that are specific to the problems that are leading to the removal of these children. Without giving these parents a fighting chance, terminations are going to be happening all over the place. Now there are some situations where the standard service plan, counseling, treatment, all those things are going to be beneficial and solve the problems of the cases. But every one of these need to be crafted to fit the needs of the parents and the children. Because the goal is unification of the families or reunification of the families here. And without adequate service plans, that's never going to happen. Now, I can't say that had this service plan been crafted to meet the mother's needs, that the end result might not have been the same. I don't know. But mom didn't even have a chance here to comply with the service plan and try to get her kids back. She made some efforts here and there as documented in the progress reports. But none of these progresses that she made were sufficient. And there were certainly deficiencies. But the important thing here is to try to reunify the families and give the parents a fighting chance. Without having a fighting chance, then the system is just geared towards terminating these parental rights and splitting up the families. In regards to the issue of best interest, the best interest issue is a much lower burden, as the courts are aware. And these foster families are pretty much always very good people. So the best interest issue, there's not a lot to fight about in this case. But I submit that had the service plans been crafted appropriately in the beginning, we might not have even gotten to the best interest issue, because we might not have gotten to the unfitness here, had there been opportunities for the mother to comply here. Realizing the state's disadvantage to comply, let me ask you this question. Assuming this court should look at the facts exactly as you have stated, what is the appropriate standard of review for this court to look at this review? Well, the appropriate standard is whether it's against the manifest way of the evidence. And I believe it is. I don't believe that there was sufficient evidence presented by the… How is an opposite result nearly apparent? Well, I think the opposite result is clearly apparent, because I think had the trial court been presented with evidence whether or not this service plan was truly crafted for the individual, there would have been a good opportunity to evaluate whether there was reasonable progress and reasonable efforts made. I don't believe that there was sufficient evidence presented to the court to truly see whether or not there were reasonable efforts or reasonable progress made. And had there been evidence presented, there may have been a different result at the unfitness stage. Thank you, counsel. Thank you. We'll have an opportunity for reply. Mr. Hudson? Good morning once again, Your Honors. I represent the respondent, the appellant's father in this case. You are Mr. Tim Hudson? I am Mr. Tim Hudson. That's correct. Thank you, Judge. Sometimes I overlook the obvious. May it please the courts and may it please counsel, at the time, as Mr. Gozia pointed out, that the children were removed from the home that my client and his client shared. My client had previously left for the day. He was gone in the morning doing some business, running some errands over in Salem. The family resided at that time in Sandoval. When he left, there was a cousin or an acquaintance of the family that was home with the children. He came home around 8 o'clock, 8.30 in the morning. The mother of the children was there. My client and this cousin or acquaintance then left to go to Salem to do some other errands and business. I think the acquaintance may have had a court appearance. When they left, the children were home in the care of their mother. Now, I'm going to make an argument that I've recently made. The original reason that the children and the family were brought into care was they were found outside unsupervised. That's unacceptable. There's no argument about that. But if we also consider that my client's involvement was when he left, Mom was taking care of the kids. Even if he's aware of medical issues and other things involved in her life that may, at times, affect her ability to appropriately care for the children, when he left that morning, I don't think that there's anything in the record that would give us reason to think, well, that was a terrible idea. He should not have done that. When he left, the children were, as far as he knew, they were in good hands and they were to be cared for and looked over. Once the family comes into the system, comes into the juvenile court system, we often learn of other items, other things that have to be addressed, other problems going on with the families, and other areas for improvement that parents need to oftentimes work on. That's when we get the family service plans. As the court knows, those family service plans are relatively detailed and they can serve as a checklist of things to be worked on, things to be improved by the parents. If we look at the requirements of the family service plan as it relates to my client, the first nine-month period alleged in the petition to terminate rights, July 22, 2015 through April 15, 2016, there were approximately 21, 22 items that my client was called to address. By the end of that time period, by April 15, 2016, he had completed 12 of those items. Twelve is certainly not 21 or 22, but 12 is certainly more than 3, 4, or 5. Shortly after the family first came into the juvenile court system, in July of 2015 already, my client had started therapy at the Community Resource Center. He completed the requirements for a substance abuse treatment and had been opened up for mental health counseling. He was already living in a home that no one had said, other than the children being able to get out, that the home was unsafe. And to that point, upon one of the first meetings with a counselor or with a DCFS worker, the parties acknowledged that there was a safety threat to the minor children, and they purchased some child safety resources. I don't think the record ever says or ever shows exactly what those items were. But the important thing is that within a very short time period of these children getting outside, both parents recognized, that's not okay, we need to get something for our house to try to prevent that from happening again. That's certainly a positive step in the right direction to making sure that problem doesn't happen again. This is, again, relevant because the home appears to otherwise be suitable for a family and for children. Once they make some adjustments or some improvements or purchase these child safety resources, it made the home that much more secure, that much better for the family and for the children. Throughout the case, my client was self-employed at times, doing maybe odd jobs or larger jobs for some people. On the day the children were found out, he testified he was working on an asphalt job in Salem. There were other times throughout the case where, for short periods, he had employment elsewhere. I think he was a factory worker at one time. But he was working. He was trying to provide for his family. As a self-employed person, I'm sure he was out frequently, going longer than someone with a nine-to-five job might be. So there was going to be more reliance on the mother. That's also going to make it harder for him to complete some of these items in his family service plan. Getting back to what he had already accomplished in July of 2015, immediately after coming into the juvenile court system, they were also on a wait list for in-home parenting classes. That's at the very beginning of the first nine-month period. He's already doing these things. When we get to January of 2016, the parties had moved into an apartment out of the house that they were living in. Again, there's no indication that this apartment was unsuitable for children. They were taken off a wait list for the in-home parenting classes. And he was getting three hours a week of visitation with the children, supervised either by a DCFS or CARITAS caseworker for one hour a week. And two hours a week was to be supervised by the foster parents. And again, by April 15, 2016, the end of the initial nine-month period, he completed 12 of the items on his family service plan. Subsequent family service plans added some additional requirements and took, by my count, approximately four of the original requirements away. So when we're looking at what did he do now on later service plans, the numbers don't exactly match up. He had 22 and they added 11. I think he ended up with 29 or 30. He didn't end up with 34 or 35. And there's overlap also in these nine-month periods that are alleged. The first one is July to April. The second one is November to August. So from April of 2016 to August of 2016, the new four-month period, which is the last four-month period, last four months of the second nine-month period in the petition, my client had also completed the in-home parenting classes. Now he wasn't completing those at home all the time with the caseworker and with the mother because of his attempts to work and his being self-employed. He was actually doing, the caseworker was leaving some homework there for him. The counselor was leaving homework for him to do. So I submit that he actually put in more effort and it was harder for him because not only is he gone during the day when these classes or these counseling sessions are taking place at home, he's out working and then when he gets home, he still has to do the requirements of those counseling classes. I would also note that the trial court, Judge Sanders, in one of her rulings, I think it was the fitness ruling, stated that my client tried very hard to complete the items in his family service plan. Well, that leads me to the question, if trying very hard is not a reasonable effort, what is a reasonable effort? What can there be beyond trying very hard that you have to do to say that you're putting forth a reasonable effort? Much of these same arguments, these same statements can apply to progress. I think the biggest progress that was made was very early on when they bought these child safety resources to try to prevent the children from getting outside again. They knew it was a problem. They knew that that was not something that can happen if they want to remain a family. They took those steps right away to make things, to prevent that from happening again. Again, as I stated also, in August of 2016, they completed the in-home parenting classes. So they're completing something I submit is certainly a reasonable progress and for these reasons, we would ask that the trial court's order be found to be against the manifest way of the evidence. Any questions, Judge? Thank you. Thank you, Counsel. We'll have an opportunity for reply. Counsel for Appellee. May it please the Court. Counsel, Chelsea Kasten on behalf of the State. Your Honors, in this case, the trial court properly held that the respondents were unfit parents who failed to make reasonable efforts and progress over the course of two years following the removal of their children from the home. In the best interest of the children, the respondents' parental rights were terminated and the boys were freed up for adoption where the boys' foster homes are eager to make them permanent parts of their families. First, I'll address Dad, and then to the best of my ability, I'll address Mom. Your Honors, first, the boys were taken initially for problems with inadequate supervision, but this was not a first-time offense. This was actually the fourth time that DCFS had gotten involved, and it was the second time within a month that they had to be called, the first time being that the youngest boy was out at the beginning of April laying in the street again in nothing but a diaper. Absolutely, no argument from any side that that's not acceptable, but then less than a month later, you have all three of those boys playing in that same busy street unsupervised. There can be very little argument that there wasn't some kind of notice that something needed to be done. Maybe Mom needs a little bit more help at home because she can't take care of the kids by herself. Dad can't just leave because he has noticed that there's the potential for those children to be endangered again. Prior to those two instances, there was also an issue with housing where they were reported because the children were filthy. There was feces all over the home. Mom and Dad did get that together. However, there were prior instances where the house is just not a good place for those boys to be. Looking at the respondent's particular point of view, the respondent alleges to have completed many of the goals set on each of the service plans, but he ignores the fact that there were secondary parts to those goals, which were things such as follow up or maintain or continue to meet the goals that are set out. That was one of the biggest issues that the trial court had when they determined that he was an unfit parent because he might have done the worksheets to learn how to be a parent, but then he never displayed any of what he was supposed to be learning with the boys. He was told he was being too rough with them, and sometimes he would just get on his phone during visits and not interact with the boys at all. Other times, he just would completely not show up for visits. During supervised visits, he would be too rough, he would be on his phone, or he just wouldn't show up, and he wouldn't contact DCFS to tell them that he wouldn't be able to make it. Who did the supervising? Your Honor, there was actually two different supervisors throughout this two-year period. Case workers? Yes, Your Honor, two different case workers. Actually, the second one has gone down to Carterville, Illinois now, so she's not even with the department any longer. That's a good place to visit. Just going through the elements, Your Honor, looking at Dad, he claims that he has been self-employed. However, a part of his service plan throughout is that he had to give some kind of proof that he was self-employed. I couldn't take his word for that. Well, he never gave proof of his self-employment. He did attempt several times to gain employment. However, he said he started working on February 9th of this year, and the case worker didn't find out until she called the company, but he actually quit that job on February 14th. During that time, the case worker was actually pulling the boys out of school so that Dad could have his visits with the kids, which, obviously, you don't want to pull kids out of school. They're supposed to be learning. Well, Dad never said anything about quitting his job, and during that time, he was still missing some of those visits. So, obviously, failing to display some of the parental responsibility that you hope is being instilled from his parenting classes. In addition, Your Honors, at one point, Dad did find sufficient housing. He was approved to start having visits with the kids in the home. However, Dad continued to have the visits out in the community if he showed up for them, and then he moved. So, as it stands at the termination hearing, Dad actually testified to the fact that he was in a home that needed renovations, including plumbing, and admitted that it would be a while before the home was in a state that would be appropriate for the boys to be in. I suppose trying to turn to Mom and Dad combined, Mom and Dad have some relationship issues that have become noticeable towards the later part of the record. There was an incident where the police were involved one evening where Mom and Dad were calling the police on each other, making different allegations. They had an on-again, off-again relationship that doesn't really instill very much stability into a child's life. They sometimes would go to supervised visits together. Sometimes they wouldn't. Sometimes they had separate ones. The caseworker would attempt to have Mom and Dad come to the visits together if they were together again, and sometimes one or the other would show up and the other one wouldn't. It just doesn't bring about a very good example of reasonable progress or effort to show stability for your children or demonstrate what you're learning in order to get your children back. Mom's service plan, she was supposed to have a substance abuse assessment. She was supposed to make substantial progress in parenting and incorporate that. That's the biggest part of that element, Your Honors, is incorporating what you're learning in your parenting classes. She was supposed to make consistent visits with her children that were supervised. She was also supposed to voluntarily do drug screenings as she was ordered to do them. First of all, she did not comply with the drug screenings. The few times that she did, they came back positive. Those would be in December... Sorry, Your Honors, I apologize. Actually, I apologize, Your Honors, that was Dad. Dad billed his drug screening for an automatic positive because he failed to show for drug screenings as well. In terms of Mom's visits with the boys, she actually got aggressive with the caseworker to the point that the caseworker felt threatened, and so they had to make some adjustments before she could continue her supervised visits with the boys. They obviously had to be out in the community at that time. At the current moment, Mom and Dad are roommates. I'm not really sure if that means they're together or not. They term themselves as roommates. Mom also has not obtained adequate housing for the children to live in because, again, it has to be renovated. They have to even get plumbing in this home. The house has not been looked at by a caseworker because they were supposed to call when they felt that it was adequate for it to be looked at to see if the boys could come by for a visit. They never called. In terms of looking at the goals that were set in each service plan, there's not a magic number that can be checked off to make something reasonable. The reason that these cases are so fact-specific is because some of these goals aren't particularly big. It's giving permission to have someone come and look at your home. It's agreeing to go get an assessment done. Some of these goals are not particularly big. There's not a magic check that, oh, Dad finished 15 of these goals. There's not a checkbox for this to make something reasonable. It has to be looked at on an individual basis. In this case, the trial court looked at that and felt that Dad still wasn't making any reasonable progress or efforts in order to get the boys back. He did make some efforts. There's no doubt about that. There's no doubt that he loves his kids, but he couldn't get it together in time to get his children back. It came to a point where the trial court had to say, it's time to consider stability and reliability for these boys. It's been two years. They determined that the parents were unfit after such a long period of time where they just were not making enough progress, particularly when they have moved into a home after they were somewhere that was suitable, a place that now doesn't need new plumbing. It's just not acceptable. In addition, Your Honors, on one of the service plans, Dad was supposed to go to counseling to deal with domestic violence issues. That is before the incident where the police were called and Mom and Dad were calling the police on each other. I don't think it can honestly be said that there's been much progress in that particular area either for a service plan. The state would just hold that the trial court properly found that the parents were unfit and then they terminated the rights of the parents so that the boys can be placed with their foster parents permanently who want to adopt them. As both sides have said, there's really no question that the foster parents are fantastic in this case. So, if you have no questions about the best interest, then we would just ask that you affirm the ruling of the trial court. Thank you. Why? Your Honors, we agree with the state that there's no magic number to check off. You said that you're making reasonable efforts. We just go back to the fact that the service plan was not crafted to give Mom the opportunity to comply with the terms of the service plan and to get her kids back. And we just reiterate that not only is this case important to Mom, but it's also important to protecting families and keeping families, giving them the ability to reunify themselves after coming into the system. And we ask that this case be remanded to the trial court. Thank you for your time. Thank you, Counsel. Mr. Hedgeson. Thank you, Your Honors. Just to follow up on what Mr. Gozia stated, there is no magic number. And I'm not trying to say that 50% or 60% completion rate alone is satisfactory. But it is just one way for us to gauge what are they doing. Are they trying? Do they acknowledge what they're supposed to do? And are they doing some of those things? That's really all I think we can gauge by looking at it from a pure numbers standpoint. In regards to the state's argument that my client was not showing what he was learning in the various parenting classes and things like that when he was interacting with the children, the January 22, 2016 report notes that there was some confusion amongst the supervisors for the visitation. Either the caseworkers or the foster parents, they weren't really sure what they were supposed to be doing as far as documenting what they were observing. So if they're not documenting what they observed via the interaction, how are we going to know? How is the judge ever going to know if my client's learning from what he's applying, what he's learning in these classes? As to the foster parents specifically, I believe the record states that the foster parents were supervising two hours of visitation per week. If they're supposed to be observing and noting what they see as far as the interaction between my client and the children and whether or not my client is applying what he's learning in these classes, well, they've got to know what he's learning in the classes. There's nothing to indicate that they've got any knowledge, any basis, any qualifications to say, yes, he is learning or he is applying what he's learned in these parenting first classes. We have no reason to really put any stock into their reports should they even have provided one, which I think the record says they were really supposed to, but it doesn't look like they did. So I don't think there's any basis to say that he's not, I don't think there's an accurate basis to say that my client didn't apply what he learned in the classes. Thank you, judges. Thank you, counsel. The court will take the matter under advisement and will consider the additional briefing which has been allowed by the leader of the court from the bench. The court will stand in recess for lunch and will reconvene at 1 p.m.